4 U.S. 95
 4 Dall. 95
 1 L.Ed. 756
 Lea, Executrix, et al.
v.
Yard.
Hazlehurst et al.
v.
Dallas, Secretary of the Commonwealth.
 High Court of Errors and Appeals of Pennsylvania.
 January Session, 1804
 
 1
 ERROR from the Supreme Court of Pennsylvania. These actions depended, chiefly, on the same facts, and principles; and were argued together, both in the Supreme Court, and in this Court. The facts were these:
 
 
 2
 John Chaloner was appointed an auctioneer for the city of Philadelphia, on the 1st of August 1791, and gave a bond to the secretary of the commonwealth, in the penal sum of 2000l., with two sureties, namely, Leonard Dorsey, and Thomas Lea, who are both since dead. Richard S. Footman was, also, appointed an auctioneer on the 9th of June 1795; and gave a similar bond, with Isaac Hazlehurst, and John D. Coxe, as his sureties. The conditions of the bonds were of the following tenor:
 
 
 3
 In Chaloner's case: 'Whereas the above bounden John Chaloner was on the first instant re-appointed auctioneer, with authority to make sales by auction at any place or places within the city of Philadelphia, the district of Southwark, or the township of the Northern Liberties, or Moyamensing, according to law: Now the condition of this obligation is such, that if the said John Chaloner shall well and faithfully execute the aforesaid office of auctioneer according to law; and shall from time to time well and truly account for all public monies, which shall come into his hands, and pay the same into the treasury of the state, agreeably to the directions of the several acts of assembly of this commonwealth, which relate to auctions and auctioneers; then the above obligation to be void, and of none effect, or to be and remain in full force and virtue.'
 
 
 4
 In Footman's case: 'Whereas by a commission bearing even date with the above written obligation, the above bounden R. S. Footman has been duly appointed one of the public auctioneers in and for the city of Philadelphia: Now the condition of this obligation is such, that if the above bounden R. S. Footman shall well and faithfully discharge and perform all the duties of an auctioneer, and in all things truly and fully comply with, and execute the laws relating to the office of auctioneer, then the above written obligation to be void, otherwise to be and remain in full force and virtue.'
 
 
 5
 While these bonds, respectively, were in force, Mr. James Yard delivered to Chaloner, as public auctioneer, a considerable quantity of goods to be sold for him. The goods were, accordingly, sold; but Chaloner retained 5,011 dollars of the proceeds, which he never paid over, or accounted for, to Mr. Yard. And, at the same time, he was considerably indebted to the state, for duties received upon sales at auction. Mrs. Gapper, in like manner, delivered to Footman, as a public auctioneer, a quantity of goods to be sold for her; which were, accordingly, sold; but the proceeds never accounted for; although Footman had punctually paid into the state treasury, all the duties, which he had collected.
 
 
 6
 Chaloner being dead, an action was brought upon his bond, against his executors &c. for the use of the commonwealth, in which judgment was rendered, and the amount of the duties (being less than the penalty) was recovered.[1] Mr. Yard, thereupon, issued a scire facias, returnable to December term 1798, against the executors of Thomas Lea, one of Chaloner's sureties; while Mrs. Gapper instituted a suit upon Footman's bond, in the name of the secretary of the commonwealth, for her use. Cases, comprising the foregoing facts (redenda singula singulis) were filed in the actions respectively, with an agreement to consider them as special verdicts, for the purpose of a writ of error; and the general question submitted to the Court, was, Whether an auctioneer's bond is a security for his private customers, as well as for the payment of the duties to the state? After argument, the opinion of the Supreme Court, was delivered, seriatim, on the 24th of March 1802, by SMITH and BRACKENRIDGE, Justices, (Chief Justice SHIPPEN, and YEATES, Justice, declining to take a part in the decision, on account of their relationship to the defendants) conformably to which, judgment was entered for the plaintiff, in both suits:[2] And writs of error were brought upon these judgments.
 
 
 7
 The case was argued on the 16th, 17th, 18th, and 19th of January 1804, by M. Levy, E. Tilghman, and Ingersoll, for the plaintiffs in error, and by Lewis, Rawle, S. Levy, and Dallas, for the defendants in error. And, in the course of the argument, both sides referred to the following sections, of the several acts of the general assembly, relative to auctions.
 
 
 8
 1st. An act was passed on the 14th of February 1729, (1 State Laws, 154. Gall. edit.) 'for regulating pedlars, vendues, &c.' The preamble recites, 'Whereas of late many idle and vagrant persons are come into this province, and, under pretence of being hawkers or pedlars, and carrying goods from house to house within this province to sell, have greatly imposed upon many people, as well in the quality as in the price of the goods, and under colour of selling their wares and merchandizes, have entered into the houses of many honest and sober people, in the absence of the owner, or owners, of the said houses, and committed felonies and other misdemeanors, to the great prejudice of the inhabitants of this province. For remedying of which inconveniences, and preventing such evil practices, and to the intent that no persons may be admitted to follow the business of hawkers and pedlars within this province, but persons of known honesty, and civil behaviour,' &c. The sixth section of the act provided, 'That no person, or persons whatsoever, except as hereinafter is excepted, shall, after the publication of this act, take upon him, her, or themselves, to sell, or expose to sale, by way of vendue, or auction, any wares, goods, or merchandizes, within the city of Philadelphia, unless such person, or persons, shall be recommended by the mayor, recorder, and aldermen of the said city of Philadelphia, in their open sessions, to the governor of this province; and shall have given security to the mayor of the said city, for the time being, for the use of the corporation, in such sum as shall be agreed upon by the said mayor, &c. provided the same to not exceed the sum 500l., for his or their honest and due execution of the office of vendue-master within the city of Philadelphia, and for the due observation of the ordinances of the said city, touching the regulating vendues, or public sales, or auctions, within the same.'
 
 
 9
 2d. An act was passed on the 26th of November 1779 (2 State Laws, 245. M'Kean's edit.) 'for the effectual suppression of public auctions and vendues, &c.' to expire at the termination of the war. It provides for the appointment of a single 'auctioneer of the city of Philadelphia;' and the 9th section declares, 'that the said auctioneer shall, before he enters upon the duties of his office, become bound with two sufficient sureties, unto the president of the supreme executive council of this state, in the sum of 20,000l., conditioned for the faithful performance of the duties required of him, and for the honest and just satisfaction and payment of his employers, and every one of them. And besides the usual attestation required of the officers of this state by law, shall take an oath that he will, to the best of his skill and abilities, faithfully perform and execute the duties required of him by this act.'
 
 
 10
 3d. An act was passed on the 23d of September 1780 (2 State Laws, 406. M'Kean's edit.) 'to alter and amend,' the preceeding act; by the 2d section of which, the appointment of three auctioneers is authorised, 'who shall continue for and during the will and pleasure of president, &c. and shall give bond to the president and his successors, with two sufficient sureties, in the sum of 20,000l. for the faithful discharge of their duties, and for well and truly performing the terms and payments in any by this act directed and required:' by the 3d section it is provided, that the said auctioneers shall have an exclusive right to sell by public vendue, 'rendering and paying to the state treasurer, for the use of the commonwealth, one per centum of the gross amount of the sales, so by him, or them, made as aforesaid, in manner following, that is to say; that each any every of the said auctioneers, shall once in every three months render an account upon oath to the said treasurer, &c. of all the effects and property by him sold at any time before the said time of rendering the same account, and since his last settlement, and shall then immediately pay to the same treasurer the full amount of the said one pound in the hundred pounds upon the same account. And upon any failure in rendering the same account upon oath, or of payment of the said sum of one per centum, any auctioneer so failing, or neglecting, shall be discharged from his place, and the said bond put immediately in suit:' And by the 8th section, it is provided, that the fees or recompense of the auctioneers,' for selling at public auction, collecting the money, and paying over the same without loss or waste, shall be, &c.' a per centage, more or less, according to the nature of the specified articles.
 
 
 11
 4th. An act was passed on the 13th of April 1782 (2 vol. State Laws, Dall. edit.) by which the compensation of the auctioneers was reduced, 'for their expences and trouble in selling any property at public auction, collecting the money and paying over the same without loss;' an additional one per centum was charged on the gross sales, for the use of the commonwealth, to be accounted for and paid over, as the preceding law directs, under the penalty therein mentioned; and it was declared, 'that the several bonds given by the said auctioneers to the president, for the faithful performance of the duties of them required by the aforesaid act, shall be a security for the payment of the one per centum imposed by this act.'
 
 
 12
 5th. An act was passed on the 9th of December 1783 (2 State Laws, 169. Dall. edit.) by which the previous acts (with certain exceptions) were made perpetual; auctioneers were prohibited from buying, at public sales, on their own account; and, it was repeated, that if an auctioneer failed or neglected to account, he should be discharged from his place, and his bond put in suit.
 
 
 13
 6th. An act was passed on the 19th of March 1789 (2 vol. State Laws, 680. Dall. edit.) by which the appointment of an auctioneer for Moyamensing was authorised, who should give bond, with two sufficient sureties, in the sum of 2000l., 'for the faithful discharge of his duty, and for well and truly performing the terms and payments in and by this act, and the several acts of general assembly, to which this is a supplement, directed and required.'
 
 
 14
 7th. An act was passed on the 27th of March 1790 (2 vol. State Laws, 777. Dall. edit.) reducing the duty on sales to one per cent., and authorising the appointment of two additional auctioneers, who shall give bond 'with two or more sufficient sureties, in the sum of 2000l., conditioned for the faithful discharge of their and every of their respective duties, and for well and truly performing the terms and payments in and by this act, and the several acts of general assembly to which this is a supplement, directed and required.'
 
 
 15
 8th. An act was passed on the 26th of February 1791, (3 State Laws, 91. Dall. edit.) by which the restriction upon the auctioneers to sell goods only within the districts, for which they were respectively appointed, was repealed and annulled.[3]
 
 
 16
 For the plaintiff in error. 1st. It is proper to premise, that the present suits are instituted against sureties, after the principals are insolvent and dead. And, independent of any peculiar hardship in this case, it is a rule of law, as well as of equity, that the responsibility of a surety, shall never be extended beyond the strict letter of his contract. 2 T. Rep. 370. 2 Wils. 379. 4 Vez. jr. 788. Nor is the contract to be regarded in the same rigor, as if it had been expressed by the parties themselves, in their own terms; instead of being prescribed by a legislative act. In such a case, the meaning of the terms employed by the legislature, should be unequivocal, plain, and clear, before it is adopted, as the meaning of the surety, to bind him in a manner so injurious and oppressive. 2d. The acts of the assembly of the year 1780, 1782, 1783, 1789, and 1790, were in force, when these auctioncers were appointed; they direct that bonds shall be given, and they prescribe the terms of the condition of the bonds; but they do not expressly, in any instance, declare the bonds to be a security for private customers. From the year 1729, until the 26th of November 1779, although several acts were in force to regulate sales at public vendue, there is, likewise, no express provision to be found, declaring the bond of an auctioneer to be for the use of the individuals, who employed him. Then, the only act, in the whole of the system, with all its successive modifications, by which the bond is expressly appropriated to the protection of an injured customer, is the act of the 26th of November 1779. 3d. The act of the 26th of November 1779, by adding to a provision, 'for the faithful performance of the duties required of the auctioneer,' a provision 'for the honest and just satisfaction and payment of his employers, and every one of them;' shows it to be the sense of the legislature, that the expressions of the former, would not embrace the objects of the latter provision. 4th. The duration of the act of the 26th of November 1779, was limited, by its own terms, to the continuance of the war, and the limitation, of course affected the supplemental acts of 1780, and 1782; but the act of the 9th of December 1783, rendered the supplements perpetual, and so much of the act of 1779, as was not thereby altered, or supplied. Then, it is to be considered, that the act of 1780, made expressly 'to alter and amend' the act of 1779, not only increases the number of auctioneers, but prescribes a new condition to be annexed to their bonds; to wit; 'for the faithful discharge of their duties, and for well and truly performing the terms and payments in, and by this act directed and required,' totally omitting the passage in the condition before prescribed, 'for the honest and just satisfaction and payment of the employers,' of the auctioneer. 5th. The terms of the condition prescribed in the act of 1780, supplied and superseded the terms of the condition in the act of 1779; they do not mean the same thing, and particularly, they do not both embrace the rights of the individual employers, as well as the rights of the public. Thus, the duties referred to by the act of 1780, are the duty of keeping a regular register of horses, and of accounting to the state; and of acting fairly between buyer and seller; while 'the terms and payments' required to be performed, are those which are, specifically, directed and required 'in and by this act;' and the act no where directs or requires a payment to the employers but only to the public. It is true, that the act of 1780, as well as the act of 1779, declares, that, 'for selling at public auction, collecting the money, and paying over the same without loss or waste,' the auctioneer shall be allowed a per centage; but there is in this provision no duty prescribed, no terms and payments stipulated; nothing that relates to a surety, or can affect him: it is merely an enumeration of the services to be performed, by the agent, in consideration of the compensation which the law allows him to demand and receive. 6th. The legislative intention to limit the operation of the bond to a governmental security, may be fairly inferred from a variety of considerations: the smallness of the penalty; the change of expression, to exclude as it were, the opposite construction, when a public duty was first imposed by the act of 1780; the increase of the number of auctioneers, which gave individuals a selection, and so far rendered a provision in their favour unnecessary; the express provision uniformly made for individuals by the legislature in every other case of an official bond; and, finally, the general understanding of the bar, expressed in various opinions given upon the case of Major Boyd. 3 State Laws. 131. Dall. edit. 7th. It is not a sufficient answer to these arguments, that auctioneers are public agents, possessing a monopoly of the sales at public vendue, to whom private citizens are obliged to resort; and, therefore, ought to be protected. In the first place, the regulations of the acts, though they compel individuals to employ the public auctioneer, do not prevent a special contract between them, as to the collection of monies, nor even as to the rate of compensation. Besides, it is not true, that the acts expressly empower the auctioneers alone to collect the proceeds of sales; and the general rule of law is well established, that where the dissenting principal declares himself, a vendee cannot be discharged by a payment to the agent. 2 Vez. 221. Even in the case of a compulsive agency, if the employer pays the duty and commissions to the auctioneer, he may sue the vendee for the purchase money. 7 T. Rep. 359. And in some cases, a contrary doctrine would be iniquitous: for, suppose the auctioneer becomes bankrupt, before the money is collected; may his assignees collect the money, and put the employer to a dividend? Or, suppose the sales are made for approved notes, at distant periods, shall it be deemed right and lawful, that the auctioneer shall take the notes, and hold them, or use them, at the risque of the employer, till the credit is expired; and, possibly, till the money is recovered upon them in an action at law! [103]
 
 
 17
 For the defendants in error. 1st. The general question is, whether the official bond of an auctioneer, is a security for his fidelity towards individuals, as well as towards the public? On this question, whatever is the meaning of the legislature in the acts of assembly, is the meaning of the parties in the bond. Both principal and surety and bound, according to that meaning; and beyond it neither of them is bound. The only distinction here between the principal and surety is, that the principal may be liable either at common law, or on the bond; but the surety can only be liable on the bond. 2 T. Rep. 105. 1 H. Black. 186. On the true construction of the bond, however, the surety, as well as the principal, would be liable, even beyond the direct letter (though the present case requires it not). 4 B. P. C. 87. And the obiter dicta of Buller in 2 T. Rep. 370. must be explained by the subject matter; while the authority of 2 Wils. 379. yields to the contrary decision in 1 T. Rep. 291. 2d. Under every modification of the office, duties, and bonds, of auctioneers, the legislature meant to protect the customers that employed them, as well as the government that appointed them. On principle, it must be meant, since the legislature takes from private individuals the right of chusing their own agents; and, from analogy to other public officers, it must be meant; for, there is not a single instance in the whole of our code, where an official bond is not, either by express words, or the established, practical, construction, held to afford remedy and relief to injured private persons; as in the cases of sheriffs, coroners, administrators, &c. Cowp. 140. (against Ambl. 183.) 3 Atk. 248. 2 Inst. 650. Vaugh. 334. 12 Co. 30. b. But the same meaning is clearly, and necessarily derived, from the words of the legislature, in the acts under immediate discussion. Thus, the act of 1729, was passed, because street vendues, &c. had become a nuisance; no revenue, or other public object, than to ensure fair dealing, was contemplated; and the condition of the bond was simply 'for the honest and due execution of the office.' No other honesty, or duty, could be in view here, than honesty and duty towards the customers of the auctioneer. True, the bond was given for the use of the corporation, and the customers had no personal remedy upon it; but still it operated as a penalty for their protection; and if the auctioneer was dishonest, or failed, in any way, to do his duty, the forfeiture was absolute under the act of 1729; while it is now contended, that under the act of 1780, so far as security is concerned, if he is honest to the public, there can be no forfeiture of the official bond, let him be ever so fraudulent towards the private citizen. The act of 1779 confirms expressly the legislative meaning to be in favour of giving a security to the employers of auctioneers, both in the terms of the condition of the bond, and the oath of the auctioneer; and although the phraseology is changed, the substance of the provisions remain the same; 'an honest and due execution of the office,' under the act of 1729, certainly including 'an honest and just satisfaction and payment of the employers,' as well as a performance of the general duties of the office. But in the act of 1779 'the use for the corporation,' is discontinued; no other use of the official bond is declared; the penalty, reduced by the scale of depreciation, is nearly the same as before; certain duties are prescribed in the 9th and 10th sections (such as a search for offenders, and collecting and paying over the proceeds of sales) but even under this act no duty is contemplated to be raised, on sales at auction. Then, the essential inquiry rests on the act of 1780, which, as well as all the subsequent acts, passed, not to repeal, but to alter, amend, supply, or enlarge, the provisions of the act of 1779; and being, in pari materia, must be considered together, in order to ascertain the true meaning of the system. The act of 1780, is the first that contemplates a revenue from sales at auction; but, independent of the provisions to secure the revenue, it continues, in substance, the provisions to protect the employers; particularly making it a duty, on which the right of compensation arises, to collect the proceeds of sales, 'and pay over the same, without loss, or waste.' But it is urged, that the act of 1780, when it prescribes the condition of the bond, omits entirely the previous stipulation, 'for the honest and just satisfaction and payment of employers;' and claims from auctioneers only 'the faithful discharge of their duties, and well and truly performing the terms and payments, in and by this act directed and required.' The omission suggested, was correct; for, in the previous act, the stipulation was tautologous and surplusage; as the duties of the auctioneer (which he was bound to perform) were emphatically to collect the money and make payment to his employers, no revenue being at that time in contemplation. The appointment of the auctioneer, fixes his duties, as does the appointment of a sheriff, &c. without specification, or detail. Selling, collecting, and paying, form the great outline of those duties. The first and second are common both to the state, and to individuals; and, as to the third, it branches into a payment of the tax to the state, and of the purchase money to the individuals. Besides, 'the terms and payments directed and required in and by this act,' are, also, to be performed; and the payment to the employer is required by the act, as well as the payment to the state. In short, the two members of the condition of the present bond, fortifying and sustaining each other, must embrace all the duties, all the obligations, which the laws impose upon an auctioneer, or the meaning will be constrained, and inconsistent with the general import of the words. 3d. But in opposition to the meaning of the legislature thus deduced, every kind of inference is offered, as well from the silence, as the expression, of the laws. It is said, that neither principal or surety are liable to the employer, for a performance of their duty to him; because the act of 1780, and the subsequent acts, do not say so expressly, as the act of 1779 did; and because the penalty of the bond is inadequate to afford an indemnity for the injury to which, we contend, it applies. If, therefore, the words omitted had been remained, the controversy must so far have ceased; and the only question is, whether words equipotent, or even more extensive for the object, are not employed. But as to the second difficulty, it sounds in this absurdity, that because the bond is not sufficient to protect the employer entirely, it shall not protect him at all. Is the sheriff's bond, is a surveyor's bond, is every administration bond, found commensurate with the possible delinquency, or defalcation? And is it conceivable, that because a surety is called on for less than the loss, that, therefore, he is to pay nothing? But, the truth is, that the sum is more adequate now, than under the act of 1779, when its application to the relief of the employer, is admitted. It is raised from the scaled value of 518l. (on 20,000l. at 38 1/2 for one) to the specie value of 2000l. The increase of the number of auctioneers, virtually augments the fund for the indemnity of individuals; the restriction to sell in their respective districts (while in force) limited the quantum of custom of each auctioneer; and the obligation to account quarterly with the state, under the penalty of an immediate dismission from office, reduced the demand of the state for an indemnity to a mere possibility. Neither the first tax of one per cent., nor its subsequent accumulations, could, under such circumstances, require the protection of a penalty of 2000l. from six auctioneers. Park. 273. Something more must be protected than the revenue; the general provision of the act of 1713, (1 vol. State Laws, 102. Gall. edit.) gives a ground of exposition from all official bonds; and when revenue only is meant to be protected; or the penalty is to operate as a punishment to the delinquent, not as a relief to the injured; in the English statutes, as well as in the Pennsylvania code, the language of the legislature is appropriate and unequivocal. 19 Geo. 3. c. 56. s. 7. 1 Anstr. 586. 4th. If arguments ab inconvenienti may avail, what can be more forcible, than the inconvenience which proceeds from the opposite construction, when the auctioneer is regarded as a public agent, invested with the exclusive right to collect the monies on sales at auction? The rule is different as to a common law agency; where there are three voluntary parties, the owner, the agent, and the buyer; 2 Vez. 221. and the difference is not destroyed, though modified, in the case of an agent del credere. Bull. N. P. 130. 7 T. Rep. 359. Here, however, the licensed auctioneer is not only a legislative agent, del credere, to the buyer, but the state constitutes a fourth party, giving the law to every part of the transaction, to every degree of the responsibility. The auctioneer is, thus, a trustee for the state. He, not the owner of the goods, nor the buyer, must pay the duties to the state; and he gives the security, not the owner. It naturally follows (and so is the practice) that immediately upon a sale, the auctioneer becomes the debtor to the owner of the goods, as well as to the state. The owner does not know the purchaser, and seldom inquires for him. The knowledge, or the inquiry, would be superfluous, as the auctioneer alone possesses the power to collect, as well as to sell: it is a vested right, by operation of law, and not, in its nature, assignable. 2 Dall. 174. 1 H. Black. 81. Willing v. Roland.[4] But, it is an universal principle, that where a power is given, a duty arises. The sheriff has a power to execute a capias; and, therefore, it is a duty to do it. The coroner has a power to hold inquests; and, therefore, it is a duty to hold them.
 
 
 18
 After deliberation, the COURT were, unanimously, of opinion, that the auctioneer's bond was intended, by law, for the benefit of his private customers, as well as for securing the duties payable to the government:
 
 
 19
 And, therefore, the judgments of the Supreme Court were affirmed; and the records remitted for further proceedings.[5]
 
 
 
 [1]
 See 3 Dall. Rep. 500.
 
 
 [2]
 I have been favoured with a note of what was said by the Judges ; from which, in substance, may be collected the following principles.
 SMITH, Justice. This is strongly pressed as a case of sureties, against whom an obligation ought never, it is said, to be extended, beyond the strict letter. 2 T. Rep. 370. But, the truth is, that where there is a joint obligation, the law does not, abstractedly, recognise the character of a surety: and, after all, sureties must be bound, according to the true construction of the obligation, whatever may be the form of the expression. 1 Br. Ch. 87.
 The essential question, therefore, is, to what duties, does the condition of the bond refer? It is a general rule, resulting from a view of our whole official system, that where an officer gives a bond for the performance of his duties, it shall operate to protect the individuals, who are obliged by the law, to resort to his office, as well as the public, by whom he is appointed. From many instances, it is sufficient to mention those of sheriffs, coroners, and surveyors. The instance of an auctioneer, independent of the positive provisions of the statute, seems, at least, to be, as much as any other, within the reason, principle, and policy, of the rule. He is public agent, with an exclusive authority to sell at vendue. Individuals cannot employ any other agent for the purpose of selling their goods; and it is the uniform practice to leave to him, too, the collection of the purchase money. Indeed, I cannot perceive how the owner of the goods could consistently with the various provisions of the laws, maintain an action against the vendee, for the price, in his own name. I grant, that the general rule is, that he who sells by another, is in contemplation of law, the seller himself, with the right of action to recover the price: but that rule applies only, where the owner of the goods may chuse his agent, and not where he is obliged to employ the agent of the public. 2 Stra. 1182. Inconveniences might easily be suggested, arising from the opposite doctrine. Auctioneers often advance money on goods sent for sale: would it be just that the owner should still have the power to demand and recover the price, from the purchaser? On a sale, the state acquires a right to the duty, as well as the owner to the purchase money: shall the owner be allowed to recover the duty, as well as the price; or must the vendee be exposed to two demands, and two suits? If, then, upon motives of public policy, a Public agent is imposed on the citizens for the sale of their goods, nothing but express words would warrant our supposing, that the legislature, while they took a bond to protect the collection of a small revenue, meant to leave unprotected, so great an amount of private property.
 The very smallness of the penalty of the bond, has, however, been urged as an argument, to show, that it could not be the intention of the legislature, to embrace the interests of individuals, as well as the rights of the state. To this objection, I answer: 1st. That, in proportion to the responsibility, the penalty is larger, than in the case of sheriffs' bonds. 2d. That there are several auctioneers, each giving a bond in the same sum; and the vendor may consider which of them, and his sureties, may be most safely entrusted. 3d. That by the condition of the auctioneer's bond, the sums collected, are to be immediately paid over; whereas, in the case of a sheriff, the monies levied may be retained for a considerable time.
 Upon the whole, I think judgment must be rendered for the plaintiff.
 BRACKENRIDGE, Justice. The act of the 23d of September 1780, is the first that reserves a per centum for the state, on sales at auction: but it will not be said, that adding to the duties of the auctioneer, diminished the effect of the obligation. Every duty, which an auctioneer is bound to perform, is embraced in the terms of the condition; and paying over the proceeds of the sales to his employers, is expressly a duty.
 The reduction of the penalty of the bond from 20,000l. to 2,000l., might raise a presumption, that when a revenue was contemplated, the revenue only was to be protected; were not that circumstance rebutted, by considering the relative value of money, at the two periods of passing the laws.
 Then, the auctioneer is a public agent, who must be employed to sell goods at public vendue. He is not only the exclusive agent to sell; but the law, obviously, makes him the exclusive agent to collect the amount of the sales: the owner of the goods cannot forbid the payment to the auctioneer, and recover the purchase money himself. In such a state of things, it is reasonable and just, that the law should protect the private citizens, who are compelled to trust a public agent, in this, as well as in any other, instance; and although the penalty is small, it is in my view a positive provision to protect the customers of the auctioneer, as well as the revenue of the public.
 Judgment must be for the plaintiff.
 
 
 [3]
 It may be proper, after this recapitulation, to observe, that the conditions of the bonds, in the present cases, were not drawn strictly in the terms of the acts of assembly; but it was agreed, to argue and decide the general question, independent of any objection, that might be made to the form of the bonds.
 
 
 [4]
 Willing et al. v. Rowland et al. in the Supreme Court, 1791, before M'KEAN, Chief Justice, and RUSH and BRYAN, Justices. This was an action of assumpsit, for goods sold and delivered. The goods were sent by the plaintiffs to the store of John Mease, a licensed auctioneer, and were sold, at public vendue, to the defendants. Mease became, soon afterwards, a bankrupt; and the defendants refused to pay the purchase money to the plaintiffs, insisting upon a right to set-off a debt due to them, from the bankrupt. The COURT were decidedly of opinion, that the plaintiff's could not maintain the present suit; that, by law, the right of action is vested in the auctioneer; and that the common-law rule in the case of factor and principal, did not apply to the case of a public auctioneer.
 A verdict was, thereupon, given in favour of the defendant.
 Bowie and Hallowell (by the latter of whom this note is obligingly furnished) for the plaintiffs, cited Com. Dig. title 'Merchant.' B. 81. 13 Vin. Abr. 9. Roll. Rep. 337. 2 Vern. 638. 3 Bac. 519. 2 Stra. 1182. Co. B. p. 236, 7. Bradford and M'Kean, for the defendants, who cited Bull. N. P. 130. 280. 12 Mod. 514. 5. Molloy, 466.
 
 
 [5]
 In the case of Dallas v. Hazlehurst et al. the defendants paid the amount of the penalty of the bond into the Supreme Court, to be disposed of, as the Court should direct. Todd, for several creditors who had not brought suits, or whose suits were subsequent in date, to Mrs. Gapper's suit, asked the opinion of the Court, whether the creditors of Footman were not entitled to share in the fund, pro rata? Dallas and S. Levy urged, that upon principle and authority, the creditor first suing, was entitled to be first, and completely paid, before other creditors were admitted. The COURT were clearly of that opinion; and Mrs. Gapper's debt with interest was, accordingly, satisfied; leaving only the surplus of the fund for other creditors.